UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LEE GOUR,                                    )
                                             )
        Plaintiff,                           )
                                             )
        v.                                   )   Case No. 3:18-cv-30155-KAR
                                             )
ANDREW M. SAUL,                              )
Commissioner of Social                       )
Security Administration,                     )
                                             )
        Defendant.                           )


MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS AND DEFENDANT'S MOTION TO AFFIRM THE
DECISION OF THE COMMISSIONER
(Docket Nos. 12 & 16)

ROBERTSON, U.S.M.J.

    I.      INTRODUCTION

        Lee Gour ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3)

seeking review of a final decision of the Commissioner of Social Security ("Commissioner")

denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social

Security Act (the "Act"), 42 U.S.C. § 401 *et seq.* Plaintiff applied for DIB on March 5, 2015,

alleging a May 1, 2003 onset of disability due to spinal disc degeneration, a back injury, and

chronic nerve damage (A.R. at 118, 135).[1] On November 28, 2017, the Administrative Law

Judge ("ALJ") found that Plaintiff was not disabled through March 31, 2006, the date on which

_____

[1] A copy of the Administrative Record (referred to herein as "A.R.") has been filed under seal
(Dkt. No. 11).

she was last insured, and denied her application for DIB (A.R. at 15-28).[2]  The Appeals Council

denied review on July 26, 2018 (A.R. at 5-8) and, thus, Plaintiff is entitled to judicial review.

*See Smith v. Berryhill,* 139 S. Ct. 1765, 1772 (2019).

Plaintiff contends that the ALJ erred by failing to (1) afford sufficient weight to Plaintiff's

statements concerning the severity of her symptoms that existed on or before her date last

insured ("DLI"); and (2) consult a medical advisor prior to concluding that Plaintiff was not

disabled on or before the date on which her insured status expired.  Pending before this court are

Plaintiff's motion for judgment on the pleadings, which requests that the Commissioner's

decision be reversed or remanded for further proceedings (Dkt. No. 12), and the Commissioner's

motion for an order affirming the decision of the ALJ (Dkt. No. 16).  The parties have consented

to this court's jurisdiction (Dkt. No. 15).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the

reasons stated below, the court will grant the Commissioner's motion for an order affirming the

decision and deny Plaintiff's motion.

II.     FACTUAL BACKGROUND

A.     Plaintiff's Educational Background and Work History

Plaintiff was 48 years old on the date of the October 11, 2017 hearing (A.R. at 704, 708).

In March 2006, she was 36 years old, was married, and was living with her husband and her

---

[2] Because ALJ Judith Stolfo, who presided over the hearing, retired before issuing a decision, the Hearing Office Chief ALJ reassigned the case to another ALJ who authored the decision after listening to the audio recording of the hearing and reviewing the other record evidence (A.R. at 15).  *See Ciraulo v. Colvin*, C.A. No. 16-cv-30181-MAP, 2018 WL 1316206, at *1 n.1 (D. Mass. Mar. 14, 2018) ("According to the Manual on Hearings, Appeals, and Litigation Law (HALLEX) published by the Social Security Administration's Office of Disability Adjudication and Review (ODAR), a case may be reassigned where an ALJ who has conducted a hearing is 'unavailable' to render a decision for one of various reasons.") (citing HALLEX I-2-8-40-a.).  For clarity, unless otherwise noted, this memorandum will use the term "the ALJ" to refer to the ALJ who authored the decision.

three children whose ages ranged from eighteen to three (A.R. at 715). Her fourth child was born on June 19, 2007 (A.R. at 276, 709). Plaintiff obtained a GED and attended two years of college (A.R. at 136, 708). In September 1999, Plaintiff began working as a cashier, stock person, and assistant manager at a convenience/package store (A.R. at 136, 137, 165-66). Plaintiff stopped working on May 1, 2003 when she was pregnant with her third child (A.R. at 135, 716).

B.    <u>Plaintiff's Medical History</u>

Because Plaintiff contends that she suffered from disabling neck and back conditions and anxiety on or before her DLI of March 31, 2006, the background information will be limited to a discussion of those conditions (Dkt. No. 13; A.R. at 162).

1.    Physical Condition

a.    **Prior to May 1, 2003, the alleged date of onset of Plaintiff's disability.**

Plaintiff's medical records, which spanned the period from April 15, 1997 to June 13, 2001, concerned an injury to her neck and back that occurred while she was employed as a CNA at a nursing home (A.R. at 213-252). On April 15, 1997, Plaintiff sought treatment at the Family Care Medical Center ("Family Care") for left back, neck, and head pain that occurred when she lifted a patient (A.R. at 244, 250, 252). An x-ray of Plaintiff's cervical spine on that date revealed that the vertebral bodies and disk spaces were well maintained, the pedicles were intact, the facet joints were normal, and there was no encroachment on the intervertebral foramina (A.R. at 251). On April 23, 1997, Plaintiff reported that her condition had improved (A.R. at 243). She was referred to physical therapy ("PT") on April 29, 1997 after she complained that she continued to experience pain and numbness in her neck (A.R. at 248). Plaintiff was "doing better" on May 12, 1997 (A.R. at 247).

On May 16, 1997, Plaintiff sought a second opinion from Kelly Armstrong, M.D., of Medical West Associates (A.R. at 244). Dr. Armstrong noted that Plaintiff had sprained her posterior neck muscles and trapezius muscles (A.R. at 244, 246). An examination revealed normal neck range of motion, arm strength, and reflexes and no adenopathy in Plaintiff's neck (A.R. at 244). Dr. Armstrong diagnosed "pulled muscles" and indicated that Plaintiff could return to modified duty at the nursing home on May 26, 1997 (A.R. at 244, 246).

On May 27, 1997, Plaintiff reported to Family Care that her condition had not improved and she was unable to perform regular or light duty work. She complained that, at times, pain radiated to her left arm. She was prescribed a cervical collar and Advil and directed to follow up with Scott R. Cooper, M.D. (A.R. at 245).

Dr. Cooper's note of Plaintiff's June 9, 1997 visit includes Plaintiff's description of an "'aching' along the lateral aspect of [her] left arm almost as far distally as the elbow" that was "associated with a feeling of weakness." She reported that the recurrence of severe pain prevented her from performing her normal CNA duties, but she was able to perform clerical work, and that PT had increased her cervical mobility. Upon examination, Dr. Cooper noted that: Plaintiff's sitting posture was significant for the slight forward flexion of her head; her cervical mobility was full with reproduction of posterior neck pain at the extremes; Plaintiff's left superior trapezius, levator scapula, and infraspinatus were tender when pressure was applied; her shoulder range of motion was full and pain free with a negative impingement arc; her strength was 5/5 throughout both upper extremities without significant deficits; and her deep tendon reflexes were 1+ throughout both upper extremities symmetrically. Supraspinatus stress on the left reproduced some superior and lateral shoulder pain, but foraminal compression testing was

negative bilaterally. Dr. Cooper ordered an MRI "to rule out a left radiculopathy" and prescribed Nortriptyline (A.R. at 239-40).

The June 25, 1997 MRI of Plaintiff's cervical spine showed a left paracentral to lateral disc herniation partially involving the foramen at C5-6 with "moderate mass effect on the left anterior thecal sac and possible compromise of the exiting left C6 nerve root sleeve." There was no significant foraminal stenosis. A mild bilateral facet degenerative change was noted at C4-5 (A.R. at 238).

Plaintiff denied experiencing numbness, paresthesia, or weakness during her July 15, 1997 visit to Dr. Cooper. She described pain that radiated into the lateral aspect of her shoulder, but not below the elbow. Dr. Cooper noted that Plaintiff had a normal sitting posture and full cervical range of motion. There was tenderness diffusely in the scapular stabilizers on the left. Her strength was 5/5 throughout with the exception of shoulder abduction and external rotation, which were limited by pain. Deep tendon reflexes were 2+ symmetrically at the biceps, triceps, and supinators. "Foraminal compression testing was completely negative bilaterally." In view of the MRI results, Dr. Cooper paid special attention to Plaintiff's strength at the C6 distribution. Her wrist extension, biceps, and brachioradialis strength was 5/5. Dr. Cooper's impression was "[c]ervical pain with mild C6 radiculitis, but no motor or reflex changes." He ordered a brief course of manual PT and an EMG and prescribed Nortriptyline (A.R. at 237).

On August 13, 1997, Dr. Cooper cancelled the scheduled EMG because Plaintiff reported that she did not have any radiating symptoms into her left upper extremity. He "suspect[ed] that the[] radiating pain was in fact not radicular but instead musculoskeletal" and he was "concerned . . . that she ha[d] a component of facet mediated pain." He advised her to continue PT (A.R. at 236).

The record of Plaintiff's August 29, 1997 visit to Dr. Cooper indicates that Plaintiff reported that her pain had continued to decrease. She only experienced "twinges" in her suboccipital area bilaterally. Dr. Cooper noted that further treatment and follow-up could be discontinued if her condition continued to improve (A.R. at 235). Plaintiff reported that she returned to full-time duty at the nursing home in September 1997 (A.R. at 214).

Plaintiff saw Dr. Cooper about six months later, on February 23, 1998, for a "flare-up of her usual left sided neck and upper extremity pain" which had begun in mid-January when she assisted with the transfer of a patient at work (A.R. at 225, 234). After the incident, the pain in the back of her neck increased and radiated down her upper left arm to her wrist. In addition, her cervical and dorsal spine ached. She denied any sharp or severe pain. After an examination of Plaintiff which showed a negative bilateral foraminal compression test, full shoulder range of motion, the ability to hold her arm in a natural position without guarding, 5/5 strength throughout both upper extremities, no focal weakness, and deep tendon reflexes 1+ and symmetric throughout, Dr. Cooper diagnosed recurrent cervical radiculitis at C6 related to the known herniated disc. Plaintiff was cleared to return to light duty work (A.R. at 234).

On March 13, 1998, Dr. Cooper diagnosed persistent C6 (cervical) radiculopathy after Plaintiff indicated that she continued to experience pain that radiated down her left upper arm to the biceps with some occasional paresthesia in her left hand. She also had pain across her upper back. Dr. Cooper noted that Plaintiff's symptoms were "relatively mild." He recommended PT and cleared her to return to work with restrictions against heavy lifting and repetitive bending and reaching (A.R. at 233).

The April 6, 1998 record of Plaintiff's visit to Dr. Cooper indicates that Plaintiff appeared "somewhat depressed and anxious regarding her condition and work." She feared that she would

lose her job at the nursing home because she had not been able to return to full duty and her employer was not willing to provide limited duty work. Plaintiff's posture had returned to normal, but she continued to complain of pain in the back of her neck. Her upper extremity symptoms had improved "considerably," although she continued to experience "a feeling of heaviness" in that area. Dr. Cooper again cleared Plaintiff to return to light duty work. He stated that, for three months, she should not lift objects weighing more than fifteen pounds or bend repeatedly. In view of the condition of Plaintiff's cervical disc, Dr. Cooper recommended "training in a more sedentary occupation" (A.R. at 232).

Mordecai Berkowitz, M.D., an orthopedic surgeon, examined Plaintiff on May 4, 1998. Plaintiff reported that the pain in her neck had improved, but she experienced some numbness in her left arm and in the thumb, index, and middle fingers of her left hand. She was able to care for her twelve and six year old children, perform light household activities, walk reasonably well, and drive a car with an automatic transmission. Although she had attempted to return to work in March and April, she had not been able to work regularly since she sustained the injury on January 22, 1998. After examination, Dr. Berkowitz found that Plaintiff had "mild objective findings" and diagnosed "[s]prain, cervical spine herniated disc at C5-6 left." He opined that Plaintiff's neck incident of January 22, 1998 "could be related with [sic] an aggravation to the incident described in April 1997." Dr. Berkowitz stated that Plaintiff should be capable of resuming full-time work as a CNA, but she was restricted to lifting five pounds frequently and ten to fifteen pounds occasionally. He opined that "[s]he is not ready to resume unrestricted work but . . . two to three weeks of work capacity will be helpful in getting her closer to that point." He also noted that her "overall prognosis [was] somewhat clouded . . . in view of the continuation of her subjective complaints and the numbness in the hand" (A.R. at 224-26).

Plaintiff visited Dr. Cooper on May 8, 1998. She complained of weakness in her left upper extremity and pain in the back of her neck that was associated with frequent headaches. Dr. Cooper observed myofascial irritation with tender points in the suboccipital muscles and superior trapezius. Plaintiff's upper extremity strength was 5/5. He diagnosed persistent, but improved, left cervical radiculopathy. He indicated that further treatment was not warranted in view of her mild symptoms. He also stated that she should not return to her full CNA duties in the "foreseeable future," and was likely permanently restricted from performing that type of work because of the "repetitive bending and heavy, unpredictable lifting of patients" (A.R. at 231).

Plaintiff visited Dr. Cooper nine months later on February 26, 1999 complaining of a recurrence of pain in the left-side of her neck and upper extremities after she had been pain free for almost one year. She reported feeling weak when performing certain activities. The physical examination revealed normal shoulder range of motion, 5/5 strength throughout both upper extremities symmetrically, and 2+ deep tendon reflexes except in the left bicep, which was diminished. Dr. Cooper prescribed a course of prednisone (A.R. at 222). Plaintiff returned about two weeks later and reported that her symptoms had returned to their "baseline" and she was able to engage in her usual activities (A.R. at 221).

A June 13, 2001 report from John Colley, M.D., of the Fallon Clinic to the Massachusetts Department of Industrial Accidents stated that Plaintiff complained of pain on both sides of the base of her neck and in her left shoulder blades, which occasionally radiated down her left arm to the radial three fingers including her thumb (A.R. at 215). Dr. Colley's physical examination revealed that Plaintiff had full range of motion of her cervical spine, although extension was uncomfortable, and full range of motion of her shoulders, hands, wrists, and fingers. There was

no motor or sensory deficit. Both scapulae were clinically normal and Dr. Colley observed a

normal scapulothoracic range of motion when Plaintiff lifted her arms above her head. Her

heel/toe gait was normal (A.R. at 216-17). After the examination and review of the records

including the results of the June 1997 MRI, Dr. Colley opined that Plaintiff sustained the left

sided C5-6 disc herniation while lifting a nursing home patient in April 1997. Dr. Colley further

opined that Plaintiff's disability was "partial and temporary in nature." She should be limited to

lifting less than twenty pounds "on a relatively infrequent basis," and should not be required to

perform overhead work. There were no restrictions on her ability to stand, sit, and walk. Dr.

Colley stated that a medical end result could not be reached without a follow-up MRI (A.R. at

218).[3]

      **b.    Relevant treatment records after the expiration of Plaintiff's insured
         status on March 31, 2006.**

Plaintiff visited Mark S. Kassis, M.D. of Riverbend Medical Group ("Riverbend") on

August 29, 2006 with complaints of a rash on her right flank and a wart on her right foot (A.R. at

566). She expressed "no other problems or concerns" (A.R. at 566).

On December 26, 2007, six and one-half years after Dr. Colley's opinion, Plaintiff visited

Paul Azimov, D.O. of Pioneer Spine and Sports Physicians, P.C. ("PSSP") complaining that she

had been experiencing a "burning and occasionally stabbing" pain in her shoulder blade,

primarily on the left side, for several months. Plaintiff believed that carrying her baby, who was

six months old in December 2007, precipitated the pain. She reported that she exercised several

times a week. Upon examination, Plaintiff had full range of motion in both shoulders and no

pain with palpation over the subscapularis muscle. "Pain [was] concentrate[d] more in the

---

[3] The June 1997 MRI report is the only record of an MRI of Plaintiff's cervical spine in the
administrative record.

rhomboid region and close to the area of the thoracic spine." Mr. Azimov diagnosed thoracic myofascial pain,[4] left shoulder myofascial pain, and possible contribution of thoracic discogenic pain, referred Plaintiff to PT for scapular stabilization exercises, and provided her with samples of Zanaflex (A.R. at 312-13).

The next PSSP treatment record is from February 25, 2009 when Plaintiff presented with lower back pain (A.R. at 309). On June 19, 2009, Plaintiff saw Rae Davis, M.D., of PSSP for pain in her right mid thoracic spine. Plaintiff indicated that her symptoms was similar to those she experienced after her child was born in 2007. There was no evidence of neurological compromise. Dr. Davis diagnosed myofascial pain syndrome with likely underlying trigger points and recommended that she attend PT (A.R. at 307-08). On March 16, 2011, Plaintiff complained to PSSP of right forearm pain that was consistent with radial tunnel syndrome. The treatment record indicates that Plaintiff had full range of motion in her neck without reproduction of pain and full range of motion in her shoulders, elbows, and wrists and 5/5 strength in her upper extremities (A.R. at 296-97).

2. Anxiety

Plaintiff submitted treatment records from Riverbend regarding her mental health treatment. On January 31, 2006, Plaintiff visited Dr. Kassis complaining of anxiety, depression, and sleep dysfunction due to "troubles with her teenage daughter who [was] in counseling." Plaintiff indicated that she exercised regularly and did not have joint pain, stiffness, or swelling. Dr. Kassis diagnosed depressive disorder, not elsewhere classified, prescribed 20 mg. of fluoxetine (Prozac), and recommended counseling (A.R. at 586-88). On March 10 and July 28,

---

[4] "Myofascial" is defined as "[o]f or relating to the fascia [fibrous tissue] surrounding and separating muscle tissue." *Stedman's Medical Dictionary* 1016 (25th ed. 1990)

2006, Plaintiff reported that the fluoxetine "helped a lot" (A.R. at 571, 578-79). Her difficulties

with concentration, anhedonia, and sleep dysfunction had improved (A.R. at 571). On

September 25, 2006, Plaintiff sought guidance on the discontinuation of fluoxetine in

anticipation of pregnancy (A.R. at 565). On November 21, 2006, Plaintiff's pregnancy test was

positive (A.R. at 562).

There is a gap in the Riverbend treatment records between December 29, 2006 and

January 13, 2010 (A.R. at 3-4). On the latter date, Plaintiff told Dr. Kassis that her anxiety was

stable, but she wanted to continue taking fluoxetine "because of ongoing stresses related to her

older daughter" (A.R. at 442, 445). On March 2, 2010, Plaintiff reported that her mood was

stable on fluoxetine (A.R. at 438). The record of Plaintiff's July 19, 2011 visit to Elizabeth

Armstrong, M.D. indicates that after discontinuing Prozac several months earlier, Plaintiff's

insomnia had worsened, and her depression symptoms and anxiety had increased (A.R. at 418).

Dr. Armstrong prescribed bupropion (Wellbutrin) (A.R. at 418, 421). On September 1, 2011,

because Plaintiff reported that Wellbutrin made her irritable and contributed to her insomnia, Dr.

Armstrong prescribed citalopram (Celexa) to treat Plaintiff's anxiety (A.R. at 414, 418). Plaintiff

reported that her anxiety was stable on May 10, 2012 and January 4, 2013 (A.R. at 374, 377,

385, 388).

On July 22, 2014, Plaintiff reported that her anxiety had been "slightly active" recently

notwithstanding her use of Celexa, but she felt that it was "manageable" (A.R. at 334, 337).

Nine months later, on April 20, 2015, Plaintiff told Dr. Armstrong that her anxiety had improved

after Wellbutrin was added to her medications (A.R. at 331). On November 19, 2015, Plaintiff

reported that her anxiety was "better controlled" on Wellbutrin and Celexa (A.R. at 320, 323).

C.    <u>Opinion Evidence</u>

Lindsay Wright, Ph.D., conducted a consultative psychodiagnostic evaluation of Plaintiff on August 12, 2015, after the expiration of her insured status. Plaintiff reported that she left her job at a store in 2003 when she had a baby. The examiner indicated that Plaintiff's anxiety symptoms were "mild" and that Plaintiff did not present with any "significant mental health symptoms" which rendered her unable to work as of the date of the examination (A.R. at 514-16).

On May 26, 2015, K. Malin Weeratne, M.D. and Isabel Murphy, Psy.D., the state agency nonexamining consultants, noted that because there were no medical records to the date last insured of March 31, 2006, there was insufficient evidence to evaluate Plaintiff's claim of disability. Accordingly, they determined that she was not disabled (A.R. at 34-35, 37). On September 2, 2016, Douglas Poirier, M.D., conducted a reconsideration evaluation and reached the same conclusion due to insufficient evidence of Plaintiff's mental health condition during the relevant timeframe of May 1, 2003 through March 31, 2006 (A.R. at 518, 530).

D. The ALJ Hearing

Plaintiff and independent vocational expert ("VE") Michael Dorval testified at the hearing before ALJ Stolfo on October 11, 2017 (A.R. at 704). Plaintiff described the condition of her lower back, her upper back and neck, and her alleged mental impairments.

1. The Plaintiff's Testimony

Plaintiff testified that she began having pain in her lower back, which she described as "bad sciatica," in or around September 2006 when she was pregnant with her daughter who was born in June 2007 (A.R. at 709, 711, 713). She sought treatment from a chiropractor who, she

assumed, fractured her back (A.R. at 709). An MRI showed spondylolysis (A.R. at 709).[5] R. Scott Cowan, M.D., performed a transforaminal interbody fusion at L5-S1 in September 2011 and surgically removed the hardware and scar tissue in April 2013 (A.R. at 256, 490, 600, 709-10, 711).

Plaintiff indicated that she injured her neck at C5-6 in 1997 (A.R. at 714, 719). The pain in her neck was "bad" at first (A.R. at 719). It was constant and radiated down her left arm (A.R. at 719). Her injury was successfully treated with PT and anti-inflammatory medication (Ibuprofen) (A.R. at 719, 720). After the initial injury, she experienced pain if she turned her neck to the left "really fast" or slept "the wrong way," but the pain usually subsided "in a couple of days" (A.R. at 714, 720). If the pain did not subside, PT relieved it (A.R. at 714).

According to Plaintiff, she began taking medication for anxiety after her daughter was born in 2007 (A.R. at 721). She had a "pretty good" memory in 2006 (A.R. at 722).

In 2006, Plaintiff cared for her three-year-old daughter, cleaned the house, did the laundry, and shopped with her husband (A.R. at 716). Her husband did the cooking because he was a better cook (A.R. at 716). She testified that, in 2006, she could sit for two hours, stand for one hour, and walk for ten to fifteen minutes (A.R. at 717). She experienced back pain if she tried to garden or to lift heavy objects (A.R. at 718). In 2006, she had more good days than bad days because she was able to engage in more activities (A.R. at 722). Her condition on the date of the hearing was "a lot worse" than it was in 2006 (A.R. at 722).

2. The VE's Testimony

---

[5] The MRI report of April 6, 2011 showed a 6 mm spondylolisthesis with probable bilateral L5 spondylolysis and right L5 nerve root compression secondary to a disc extrusion at that level (A.R. at 275).

In order to elicit the VE's opinion of whether Plaintiff could perform her past jobs or jobs that existed in the regional and national economy, ALJ Stolfo asked the VE to assume a person with Plaintiff's age, education, and work experience,

> who [could] occasionally lift 10 pounds and frequently lift less than 10[,] . . . could stand and walk for four hours in an eight-hour day, and sit for six hours, [who] needed a sit/stand at will option defined as going from sitting to standing, and standing to sitting without impacting productivity. pushing and pulling with upper and lower extremities, occasional climbing, balancing, and stooping, but no kneeling, crouching, crawling. No overhead reaching, no hazards[.] [S]he would be limited to unskilled work.

(A.R. at 723-24). The VE indicated that Plaintiff would not be able to perform her past work as a cashier who also stocked the shelves at a package/convenience store (A.R. at 724). However, the hypothetical person would be able to work selling tickets in a movie theater or being a cashier in a parking garage, which were light, unskilled jobs (A.R. at 724). No jobs would be available to a person who was absent more than two days a month and/or who was off-task fifteen percent of the time due to pain (A.R. at 725).

III.    THE COMMISSIONER'S DECISION

A.    Legal Standard for Entitlement to Disability Insurance Benefits

In order to qualify for DIB, a claimant must demonstrate that she is disabled within the meaning of the Act. A claimant is disabled for purposes of DIB if she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A claimant is unable to engage in any substantial gainful activity when she

> is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work.

14

42 U.S.C. § 423(d)(2)(A). The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated by the Social Security Administration ("SSA"). *See* 20 C.F.R. § 404.1520(a)(4)(i-v). The hearing officer must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) whether the impairment prevents the claimant from performing previous relevant work; and (5) whether the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience. *See id; see also Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process). If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step. 20 C.F.R. § 404.1520(a)(4).

Before proceeding to steps four and five, the Commissioner must assess the claimant's residual functional capacity ("RFC"), which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work. *See id.*

> RFC is what an individual can still do despite his or her limitations. RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities

Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

The claimant has the burden of proof through step four of the analysis, including the burden to demonstrate her RFC. *See Flaherty v. Astrue*, Civil Action No. 11-11156-TSH, 2013 WL 4784419, at *8-9 (D. Mass. Sept. 5, 2013) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806

(8th Cir. 2004)).  At step five, the Commissioner has the burden of showing the existence of jobs in the national economy that the claimant can perform notwithstanding his or her restrictions and limitations.  *See Goodermote*, 690 F.2d at 7.

B.      The ALJ's Decision

In determining whether Plaintiff was disabled, the ALJ conducted the five-part analysis required by the regulations.  *See* 20 C.F.R. § 404.1520(a)(4)(i-v); *see also Goodermote,* 690 F.2d at 6-7.  Because Plaintiff alleged that she became unable to work because of her disabling condition on May 1, 2003, the date on which she stopped working at the convenience/package store, and because Plaintiff's DLI was March 31, 2006, the ALJ's analysis concerned Plaintiff's condition between May 1, 2003 and March 31, 2006 (A.R. at 15, 17, 23, 27, 118, 165, 716).  At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant timeframe (A.R. at 17).  See 20 C.F.R. § 404.1571 *et seq.*  At step two, the ALJ found that Plaintiff had the following severe impairments "[t]hrough the date last insured:" degenerative disc disease; a history of fusion surgery; nerve damage to the leg; chronic neck pain secondary to cervical strain and myofascial irritability; joint sprain; cervical spine herniated disc at C5-6 left; anxiety; and depression (A.R. at 18).  *See* 20 C.F.R. § 404.1520(c).  For purposes of step three, the ALJ reviewed Plaintiff's impairments and determined that her impairments, either alone or in combination, did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (A.R. at 18).  *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.

Before proceeding to steps four and five, the ALJ assessed Plaintiff's RFC for use at step four to determine whether she could perform past relevant work, and, if the analysis continued to step five, to determine if she could do other work.  *See* 20 C.F.R. § 404.1520(e).  The ALJ found

that Plaintiff's medically determinable impairments could reasonably be expected to cause her symptoms, but that her statements about the intensity, persistence, and limiting effects of the symptoms were not fully supported by the objective medical evidence and other relevant evidence in the record as of the DLI of March 31, 2006 (A.R. at 18). The ALJ determined that Plaintiff had the RFC to perform sedentary work[6] with the following additional limitations:

> lifting ten pounds occasionally and less than ten pounds frequently. She could sit six hours in an eight-hour workday and stand/walk four hours in an eight hour workday, but she would have needed to sit/stand, at will, which is defined as going from sitting to standing and standing to sitting without impacting productivity. The claimant could have performed occasional upper and lower extremity pushing and pulling, climbing, balancing, and stooping, and she could not have performed kneeling, crouching, or crawling. The claimant could not have performed overhead reaching. She would have needed to avoid exposure to hazards. The claimant was limited to unskilled work.

(A.R. at 21). At step four, the ALJ found that Plaintiff would not have been able to perform her past relevant work through the date last insured (A.R. at 26). *See* 20 C.F.R. § 404.1565. However, considering Plaintiff's age, education, work experience, and RFC, based on the VE's testimony, the ALJ found that, as of the date last insured, Plaintiff could have performed the jobs of a ticket seller and parking garage cashier (A.R. at 26-27). *See* 20 C.F.R. §§ 404.1569, 404.1569(a). Consequently, on November 28, 2017, the ALJ concluded that Plaintiff was not

---

[6] The SSA regulations define sedentary work as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

under a disability, as defined by the Act, at any time from May 1, 2003, the alleged onset date, through March 31, 2006, the DLI (A.R. at 27-28).  *See* 20 C.F.R. § 404.1520(g).

IV.    STANDARD OF REVIEW

The district court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing.  *See* 42 U.S.C. § 405(g).

Judicial review is limited to determining "'whether the [ALJ's] final decision is supported by substantial evidence and whether the correct legal standard was used.'"  *Coskery v. Berryhill,* 892 F.3d 1, 3 (1st Cir. 2018) (quoting *Seavey v. Barnhart,* 276 F.3d 1, 9 (1st Cir. 2001)).  The court reviews questions of law *de novo*, but "the ALJ's findings shall be conclusive if they are supported by substantial evidence, and must be upheld 'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion,' even if the record could also justify a different conclusion."  *Applebee v. Berryhill*, 744 F. App'x 6, 6 (1st Cir. 2018) (per curiam) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222-23 (1st Cir. 1981) (citations omitted)).  "Substantial-evidence review is more deferential than it might sound to the lay ear:  though certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not."  *Purdy v. Berryhill*, 887 F.3d 7, 13 (1st Cir. 2018) (quoting *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51, 56 (1st Cir. 2003)).  In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence.  *See Applebee,* 744 F. App'x at 6.  That said, the ALJ may not ignore evidence, misapply the law, or judge matters entrusted to experts.  *See Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

V.    ANALYSIS

**A.      The ALJ's determination that Plaintiff was not disabled prior to her DLI was supported by substantial evidence.**

Plaintiff argues that she was disabled on or before March 31, 2006 due to "chronic neck, upper back, and low back pain with radiating symptoms of a significant past duration" (Dkt. No. 13 at 14-15).  Plaintiff contends that the ALJ should have credited her allegations that in 2006 she could sit for two hours, stand for "maybe an hour," walk for ten to fifteen minutes, and, on her best day, her pain was seven on a scale of one to ten (A.R. at 717).  The ALJ determined that the treatment records for the timeframe under consideration – May 1, 2003 to March 31, 2006 – and the other relevant evidence did not support Plaintiff's limitations to the degree that she alleged (A.R. at 23, 26).  "[I]n a social security disability case, '[a] fact-finder's assessment of a party's credibility . . . is given considerable deference and, accordingly, a reviewing court will rarely disturb it."  *Smith v. Berryhill,* 370 F. Supp. 3d 282, 291 (D. Mass. 2019) (second alteration in original) (quoting *Anderson v. Astrue,* 682 F. Supp. 2d 89, 96 (D. Mass. 2010)).

Although Plaintiff frames the issue in terms of the ALJ's assessment of her credibility, in fact, Plaintiff challenges the ALJ's determination that she was not disabled prior to her DLI.  "It is a long-standing principle that a '[c]laimant is not entitled to disability benefits unless [s]he can demonstrate that [her] disability existed prior to the expiration of [her] insured status,' here [March 31, 2006]."  *Hughes v. Colvin*, Civil Action No. 12-11576-DJC, 2014 WL 1334170, at *6 (D. Mass. Mar. 28, 2014) (first alteration in original) (quoting *Cruz Rivera v. Sec'y of Health & Human Servs.,* 818 F.2d 96, 97 (1st Cir. 1986)).  "Despite the physical or mental condition of the claimant on the date of the hearing, the ALJ was tasked with determining disability during the period beginning with the alleged onset date of disability and ending with the date last insured."  *Id.* (citing 42 U.S.C. §§ 416(i), 423(c)).  "It is not sufficient for a claimant to establish that her impairment had its roots before the date that her insured status expired.  Rather, the

claimant must show that her impairment(s) reached a disabling level of severity by that date."

*Garcia v. Sec'y of Health & Human Servs.,* No. 93–2349, 1994 WL 235328, at *3 (1st Cir. June

1, 1994) (per curiam). *See Eichstadt v. Astrue,* 534 F.3d 663, 665 (7th Cir. 2008) (denying

disability benefits because "the record did not support a finding that the onset of Eichstadt's

disability occurred *before* her 'date last insured'"); *Biron v. Astrue,* Civil Action No. 09–40084–

FDS, 2010 WL 3221950, at *7 (D. Mass. Aug. 13, 2010) (upholding the ALJ's denial of benefits

due to the lack of medical evidence of disability prior to the DLI). The ALJ correctly identified

the date range of May 1, 2003 and March 31, 2006 as the bounds of his review when evaluating

the severity of Plaintiff's symptoms and determined, based on all the evidence, that Plaintiff was

not disabled during that timeframe.

Social Security Ruling 16-3p provides guidance on evaluating symptoms in disability

cases. According to that ruling, "[i]n determining whether an individual is disabled, [the ALJ]

consider[s] all of the individual's symptoms, including pain, and the extent to which the

symptoms can reasonably be accepted as consistent with the objective medical and other

evidence in the individual's record." SSR 16-3p, 2017 WL 5180304, at *2 (Oct. 25, 2017).[7] The

analysis involves a two-step process. *Id.* The ALJ first considers "whether there is an

underlying medically determinable physical or mental impairment(s) that could reasonably be

expected to produce an individual's symptoms, such as pain." *Id.* at *3. "Second, once an

underlying physical or mental impairment(s) that could reasonably be expected to produce an

individual's symptoms is established, [the ALJ] evaluate[s] the intensity and persistence of those

_____

[7] A "symptom" is defined as "the individual's own description or statement of his or her physical
or mental impairment(s)." SSR 16-3p, 2017 WL 5180304, at *2.

symptoms to determine the extent to which the symptoms limit an individual's ability to perform

work-related activities . . . . " *Id.*

> When undertaking the second step, an ALJ must first determine whether the claimant's
> alleged symptoms are consistent with the objective medical evidence. If not, then the
> ALJ must consider the other evidence in the record, including "statements from the
> individual, medical sources, and any other sources that might have information about the
> individual's symptoms, including agency personnel, as well as the factors set forth in [the
> SSA's] regulations." SSR 16-3p, 2016 WL 1119029, at *5. The factors to which SSR
> 16-3p refers are set forth in 20 C.F.R. § [416.929](c)(3), and are sometimes called the
> *Avery* factors . . . .

*Martin v. Berryhill*, Civil No. 18-cv-461-JL, 2019 WL 1987049, at *5 (D.N.H. May 6, 2019)

(citing *Avery v. Sec'y of Health & Human Servs.,* 797 F.2d 19, 29 (1st Cir. 1986)).

The ALJ followed the analysis required by SSR 16-3p. At the first step, the ALJ

recognized that Plaintiff's medically determinable impairments could reasonably be expected to

cause the alleged symptoms. At the second step, the ALJ found that Plaintiff's statements

regarding the intensity, persistence, and limiting effects of those symptoms on or before her DLI

of March 31, 2006 were not fully supported by the objective medical evidence and the other

relevant evidence (A.R. at 23). The ALJ's determination is supported by substantial evidence.

Although Plaintiff cited the contents of treatment records from 1997 through 2015, those

records did not support her statements concerning the severity of her symptoms on or before

March 31, 2006 (Dkt. No. 13 at 8-14). "While [a severe impairment] may have existed at some

time before the date last insured, the only medical evidence in the record is to the effect that the

condition had resolved or, at most, imposed minimal or no limitations on the plaintiff's ability to

perform work-related functions by that date." *Duckworth-Bubar v. Barnhart*, 242 F. Supp. 2d

30, 32 (D. Me. 2002). Plaintiff injured her neck and upper back while working as a CNA on

April 15, 1997 (A.R. at 252). The June 1997 MRI showed a left paracentral to lateral disc

herniation partially involving the foramen at C5-6 with "moderate mass effect on the left anterior

thecal sac and possible compromise of the exiting left C6 nerve root sleeve" (A.R. at 238). According to the medical evidence, Plaintiff complained of discomfort in her left upper back and arm intermittently from April 1997 to February 1999 (A.R. at 215, 222, 224-26, 231-34, 237, 239-40, 245). On March 12, 1999, Plaintiff reported that her condition had returned to "baseline" after she completed the course of prednisone that Dr. Cooper had prescribed (A.R. at 221-22). On June 13, 2001, Dr. Colley reported to the Department of Industrial Accidents that Plaintiff's physical examination was normal and he opined that her disability was "partial and temporary" (A.R. at 24, 218). He indicated that she should be limited to infrequent lifting of more than twenty pounds and should not be required to do overhead work (A.R. at 218). However, in his opinion, restrictions on standing, sitting, and walking were not required (A.R. at 218). *See Franceschi v. Astrue,* Civil Action No. 11-40217-TSH, 2013 WL 1285478, at *12 (D. Mass. Mar. 25, 2013) (the ALJ considered the discrepancies between the plaintiff's testimony and the treatment records when assessing the severity of his symptoms).

Plaintiff's description of her job as a cashier, stock person, and assistant manager at a convenience/package store, which started in September 1999 and ended on May 1, 2003 when her third child was born, belied her claim that the incident on April 15, 1997 caused her to suffer a disabling neck and upper back condition prior to her DLI (A.R. at 135, 136, 165, 166, 172, 716). *See Casull v. Comm'r of Soc. Sec.,* CIVIL NO: 16-1620 (MEL), 2017 WL 5462185, at *6 (D.P.R. Nov. 14, 2017) (the fact that the plaintiff worked for eight years after the dates of the medical records concerning the alleged disabling condition was a factor in the disability determination); *Blackette v. Colvin,* 52 F. Supp. 3d 101, 120 (D. Mass. 2014) (the ALJ properly considered plaintiff's ability to work following her injury as a factor in assessing the severity of her symptoms). She worked three to five days a week for five or six hours a day (A.R. at 166).

According to Plaintiff, the job entailed "a lot of moving around" (A.R. at 172). She walked, stood, or reached "most" of the time during each shift and only sat to eat lunch (A.R. at 137, 166). She sometimes lifted twenty pounds and frequently lifted items weighing ten pounds, including boxes, large bottles of wine, cases of beer and soda, and gallons of milk (A.R. at 137, 165-66, 172).

The ALJ found that the six year gap in the treatment records between Dr. Colley's assessment of Plaintiff's neck and upper back condition in June 2001 and Plaintiff's visit to PSSP in December 2007 were inconsistent with her description of the severity of her impairments in March 2006 (A.R. at 23). *See Irlanda Ortiz v. Sec'y. of Health & Human Servs.,* 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (gaps in the treatment record were "'evidence'" that was inconsistent with the plaintiff's statements concerning the severity of his back pain); *Houle v. Colvin,* C.A. No. 16-cv-049-M-LDA, 2016 WL 7396709, at *3 (D.R.I. Dec. 21, 2016) (plaintiff's failure to seek treatment supported the ALJ's determination that her subjective complaints were not wholly credible); *Arsenault v. Astrue*, Civil No. 08-269-P-H, 2009 WL 982225, at *7 (D. Me. Apr. 12, 2009), *supplemented,* Civil No. 08-269-P-H, 2009 WL 1609033 (D. Me. June 8, 2009) ("the evidence supports the administrative law judge's use of the gaps in treatment before May 2006 to cast doubt on the plaintiff's credibility."). Plaintiff did not express any "problems or concerns" concerning her neck or back during her July 2006 visit to Dr. Kassis at Riverbend (A.R. at 566). On December 26, 2007, Plaintiff visited PSSP complaining of pain in her shoulder blade, primarily on the left side, that had been present for several months. Plaintiff attributed the onset of the pain to carrying her six-month-old baby. Plaintiff reported that she exercised several times a week. She had full range of motion in both shoulders and no pain with palpation over the subscapularis muscle. D.O. Azimov diagnosed thoracic and left shoulder

myofascial pain and possible contribution of thoracic discogenic pain, referred Plaintiff to PT, and provided her with samples of Zanaflex (A.R. at 312-13). Plaintiff did not seek treatment for upper back pain for about eighteen months. On June 19, 2009, she described "a chronic ache" in her right upper thoracic paraspinal muscles. Dr. Davis assessed myofascial pain syndrome with underlying trigger points and no evidence of neurological compromise. He recommended PT and trigger point injections. Plaintiff declined participation in PT due to her schedule, but received trigger point injections in her right shoulder (A.R. at 299-308). The record of Plaintiff's visit to PSSP almost two years later on March 16, 2011 for right forearm pain indicated that she had full range of motion in her neck, shoulders, elbows, and wrists (A.R. at 296-97).

Plaintiff's testimony and her responses to a Questionnaire on Pain were inconsistent with her description of the severity of her condition prior to her DLI. *See* SSR 16-3p, 2017 WL 5180304, at *8 (in assessing credibility, the ALJ compares "statements an individual makes in connection with the . . . claim for disability benefits with any existing statements she made under other circumstances."). According to Plaintiff, the constant pain in her lower back, which radiated into her leg, was the chief source of her pain and the limitations on her activities (A.R. at 183, 184, 708-11, 713). She stated that her lower back pain began when she became pregnant with her fourth child in September 2006, six months after her DLI, and it continued after the child was born in June 2007 (A.R. at 135, 144, 181, 183, 184, 709, 710-11, 713). On February 25, 2009, she presented at PSSP complaining of lower back pain (A.R. at 309-10). Plaintiff failed to provide evidence that her lower back condition at L5-S1, which required surgery in 2011 and 2013, originated prior to her DLI (A.R. at 181-82, 183, 274-75, 461, 462, 490). [8]

---

[8] Although the ALJ's step two determination included fusion surgery and nerve damage to the leg as severe impairments "[t]hrough the date last insured," his analysis of the medical evidence through March 31, 2006 did not support that finding (A.R. at 17-18, 22-24). Because the

Plaintiff's description of her daily activities in 2006 also contradicted her description of her symptoms prior to her DLI (A.R. at 23). *See Avery,* 797 F.2d at 29 (claimant's daily activities are a factor to be considered in the pain analysis). She testified that, in 2006, she cared for her three children, including her three-year-old daughter, cleaned the house, did the laundry, shopped with her husband, and participated in family activities (A.R. at 715, 717). According to Plaintiff, she experienced more good days than bad days in 2006 and her pain on the date of the hearing in 2017 was "a lot worse than [it was] back then" (A.R. at 722).

The treatment records and Plaintiff's testimony also failed to establish that Plaintiff was disabled due to anxiety prior to March 31, 2006. Although she sought treatment from Dr. Kassis on January 31, 2006, before her DLI, she testified that her memory was "pretty good" in 2006 (A.R. at 722). The treatment records show that her anxiety was well controlled by the medication that her primary care physicians prescribed (A.R. at 320, 323, 331, 337, 377, 385, 388, 438, 442, 445, 571, 578-79). *See Cook v. Berryhill*, CIVIL ACTION NO. 14-40112-DHH, 2017 WL 1135221, at *14 (D. Mass. Mar. 27, 2017) ("An impairment that can be controlled by treatment is not disabling.") (citing *Belanger v. Apfel*, 113 F. Supp. 2d 191, 196 (D. Mass. 2000)).

To the extent Plaintiff had impairments on her DLI due to the condition of her neck and upper back and anxiety, the ALJ included restrictions in the RFC that reflected those conditions.

---

relevant evidence supports the ALJ's determination that Plaintiff's lower back condition was not disabling prior to her DLI, the error is inconsequential. *See Bennett v. Berryhill*, 256 F. Supp. 3d 93, 99 (D. Mass. 2017) ("'[w]here a subsidiary finding is unfounded, the court will remand the case to the agency for further consideration only if 'the court is in substantial doubt whether the administrative agency would have made the same ultimate finding with the erroneous finding removed from the picture . . . .'") (alteration in original) (quoting *Kurzon v. U.S. Postal Serv.*, 539 F.2d 788, 796 (1st Cir. 1976)).

The RFC generally conformed to the limitations Dr. Colley described, but it placed greater limitations on Plaintiff's ability to sit, stand, and walk than Dr. Colley deemed to be warranted (A.R. at 218). *See, e.g., Soto v. Colvin*, No. 2:14-cv-28-JHR, 2015 WL 58401, at *3 (D. Me. Jan. 5, 2015) ("[A] claimant may not obtain a remand on the basis of an RFC that is more favorable than the evidence would otherwise support."). Plaintiff was limited to lifting ten pounds occasionally and less than ten pounds frequently, sitting for six hours, and standing or walking for four hours with the ability to sit/stand at will. She could not kneel, crouch, crawl, or reach overhead and was limited to unskilled work (A.R. at 21). *See* 20 C.F.R. § 404.1568 ("Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.").

The ALJ's assessment of Plaintiff's symptoms was supported by substantial evidence. Because Plaintiff failed to sustain her burden of showing that she was disabled between the alleged disability onset date and her DLI, there is no basis to overturn the ALJ's decision. *See Duckworth-Bubar*, 242 F. Supp. 2d at 32 ("A claimant must demonstrate that her disability existed prior to the date last insured.") (citing *Cruz Rivera,* 818 F.2d at 97); 20 C.F.R. § 404.131.

**B.    Because the medical evidence concerning the onset of Plaintiff's conditions was not ambiguous, the ALJ was not required to infer the date of onset of Plaintiff's alleged disability, and, consequently, was not required to call on the services of a medical advisor.**

Relying on SSR 18-01p, Plaintiff claims that the ALJ should have obtained the services of a medical advisor to determine the date of onset of Plaintiff's disability because the medical records failed to establish the date with certainty. Plaintiff appears to argue that her upper back and neck condition, which began in April 1997, progressed to a disabling condition in her lower back and, therefore, the ALJ was not able to ascertain whether the date of onset of her disability

preceded her DLI (Dkt. No. 13 at 15-16).  Plaintiff's argument is unpersuasive for several reasons.

Social Security Ruling 18-01p applies to claims that were pending on and after October 2, 2018.  *See* SSR 18-01p, 2018 WL 4945639, at *7 (Oct. 2, 2018).  Because the ALJ decided Plaintiff's claim on November 28, 2017, SSR 18-01p does not apply.  *See id.* ("We expect that Federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions.").  Instead, the prior rule, SSR 83-20, applies.  *See id.* at *1.

Social Security Ruling 83-20 did not require the ALJ to obtain the services of a medical advisor to determine the date of onset of Plaintiff's disability.  The ruling provided that, "[i]n addition to determining that an individual is disabled, the decisionmaker must also establish the onset date of disability.  SSR 83-20, 1983 WL 31249, at *1 (1983).  "The onset date of disability is the first day an individual is disabled as defined in the Act and the regulations." *Id.*  The onset date must be "supported by the evidence." *Id.*  "Factors relevant to the determination of disability onset include the individual's allegation, the work history, and the medical evidence. These factors are often evaluated together to arrive at the onset date." *Id.*

> With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling. Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available.  In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process.

*Id.* at *2.  "At the hearing, the . . . ALJ should call on the services of a medical advisor when onset must be inferred." *Id.* at *3.

Plaintiff's allegation – that a medical advisor was necessary because it was not possible to determine the date of onset of her "progress[ive]" disabling impairments from the treatment records – is wrong for two reasons (Dkt. No. 13 at 15).  First, there was no evidence that

Plaintiff's upper back and lower back conditions were related. *See Pennell v. Colvin*, 52 F. Supp. 3d 138, 149 (D. Mass. 2014) (upholding the ALJ's determination that the plaintiff was not disabled as of the DLI where "[n]othing in the medical records . . . indicates a link between the degenerative spine impairments complained of prior to the date last insured, and the traumatic injuries incurred in 2009."). Second, treatment records were available and were not ambiguous. *See Fischer v. Colvin,* 831 F.3d 31, 35 (1st Cir. 2016). Instead, they provided "[p]recise [e]vidence" of the dates of onset of her upper back and lower back conditions. SSR 83-20, 1983 WL 31249, at *3. Plaintiff alleged that the onset of her disability was May 1, 2003, two days before the date of her third child's birth (A.R. at 135, 144, 162, 715-16). Although Plaintiff injured her neck and upper back while working at a nursing home on April 15, 1997, she stated that the birth of her third child rather than her medical condition caused her to stop work on May 1, 2003 (A.R. at 135, 144, 252, 716). Indeed, her treatment records, including Dr. Colley's June 13, 2001 opinion, her history of working at the convenience/package store from September 1999 to May 1, 2003, and her testimony that if her neck pain was aggravated, it dissipated "in a couple of days," established that her upper back and neck condition was not disabling and there is no other evidence that she suffered from a disabling impairment on the alleged onset date or at any time prior to her DLI of March 31, 2006 (A.R. at 165-66, 218, 714). Consequently, there was no basis for the ALJ to consult a medical expert. *See Mason v. Apfel,* 2 F. Supp. 2d 142, 149 (D. Mass. 1998) ("when *no* legitimate medical basis can support an inference of disability, no medical advisor is necessary.").

There was no evidence that Plaintiff's lower back condition originated on or before March 31, 2006. Plaintiff's contemporaneous medical records and her statements showed that her lower back pain began as "severe sciatica" during her pregnancy with her fourth child in

September 2006, which was after her DLI (A.R. at 135, 144, 183, 709-11). She first sought

treatment from PSSP for low back pain almost three years later, on February 25, 2009 (A.R. at

309). The April 6, 2011 MRI showed a 6 mm L5/S1 spondylolisthesis with probable bilateral L5

spondylolysis and a right L5 nerve root compression secondary to a lateral disc extrusion at that

level (A.R. at 274-75). On August 16, 2011, Plaintiff told Dr. Cowan that her low back pain,

which radiated down her left leg, began in April 2011 (A.R. at 476). Dr. Cowan performed a

transforaminal interbody fusion at the L5-S1 level on September 8, 2011 and removed the

hardware and scar tissue on April 18, 2013 (A.R. at 260, 477, 602). Because the medical

evidence was unequivocal in establishing an onset date of Plaintiff's lower back condition after

her DLI, the ALJ was not required to infer it. Consequently, he did not violate SSR 83-20 by

failing to consult a medical expert.[9] *See Fischer,* 831 F.3d at 36 (the ALJ was not required to

consult a medical expert where the "contemporaneous medical evidence was specific and

unequivocal" concerning the date of onset). *Compare Rossiter v. Astrue,* Civil No. 10-cv-349-

JL, 2011 WL 2783997, *8 (D.N.H. July 15, 2011) (SSR 83-20 required the ALJ to consult a

medical expert in setting the onset date because the medical evidence was "anything but 'plain' as

to whether [plaintiff's] degenerative disc disease was disabling as of her date last insured or . . .

at any point thereafter.").

The case upon which Plaintiff relies, *Mason,* 2 F. Supp. 2d at 142, is clearly

distinguishable. In *Mason*, notwithstanding an independent medical examiner's opinion that the

onset date of plaintiff's disabling mental impairment was prior to her DLI, the ALJ determined

---

[9] Because Plaintiff failed to demonstrate that her lower back condition existed prior to her DLI of March 31, 2006, the ALJ was not required to determine whether or not it was disabling. *See Cruz Rivera,* 818 F.2d at 97; *Pennell,* 52 F. Supp. 3d at 140 n.1 ("To be Title II [DIB] eligible, an applicant must have disability insured status as of the onset date of a disability.") (citing 20 C.F.R. § 404.131(a)).

that it was about two years after that date.  *Id.* at 146, 147.  The court determined that "the ALJ did not have a legitimate medical basis for his conclusion" in light of the medical expert's opinion and the other evidence, including the fact that "mental illness usually proceeds along a slow and progressive course."  *Id.* at 148, 149.  "Given the record available to the ALJ, the onset date of [p]laintiff's mental impairment was, at best, ambiguous," and, therefore, he violated SSR 83-20 by failing to seek the services of a medical advisor to determine whether it was reasonable to infer that the plaintiff was disabled prior to her DLI.  *Id.* at 149.  Here, in contrast, the treatment records clearly established that the date of onset of a disability, if any, was after Plaintiff's DLI.  Consequently, the ALJ was not required to consult a medical advisor.  *See id.*

VI.    CONCLUSION

For the above-stated reasons, Plaintiff's Motion for Judgment on the Pleadings (Dkt. No. 12) is DENIED and the Commissioner's Motion for an Order Affirming the Decision of the Commissioner (Dkt. No. 16) is GRANTED.  The case will be closed.

It is so ordered.

Dated:  January 27, 2020                          /s/ Katherine A. Robertson
                                                  KATHERINE A. ROBERTSON
                                                  U.S. MAGISTRATE JUDGE